No. 22-1246

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

Vanessa Dundon, et al.

*Plaintiffs-Appellants,*

v.

Kyle Kirchmeier, et al.,

*Defendants-Appellees.*

Appeal from the U.S. District Court for the District of North Dakota
Case No. 1:16-cv-406 DMT ARS
The Honorable Judge Daniel M. Traynor

## PRINCIPAL BRIEF OF PLAINTIFFS-APPELLANTS

RACHEL LEDERMAN, SBN 130192   JANINE L. HOFT
ANAM HAQUE, SBN 328081         People's Law Office
P.O. Box 40339                 1180 N. Milwaukee Ave.
San Francisco, CA 94140-0339    Chicago, IL 60642
415-282-9300                   773-235-0070
rachel@sfbla.com               janinehoft@peopleslawoffice.com


MARA VERHEYDEN-HILLIARD        MELINDA POWER
Partnership for Civil Justice Fund   West Town Law Office
617 Florida Avenue NW          2502 W. Division
Washington, D.C. 20001          Chicago, IL 60622
(202) 232-1180                 (773) 278-6706
mvh@justiceonline.org           melindapower1@gmail.com

NATALI SEGOVIA
Water Protective Legal Collective
P.O. Box 37065, Albuquerque, NM 87176
(602) 796-7034
nsegovia@waterprotectorlegal.org        *Attorneys for Appellants*

## SUMMARY OF THE CASE

Appellants responded to a historic call from the Standing Rock Sioux Tribe to come stand together in prayer and nonviolent protest to protect water and sacred sites imperiled by the Dakota Access Pipeline. On the night of November 20-21, 2016, law enforcement, under the command of the Appellees, shot nonviolent water protectors with munitions and freezing blasts of water for ten hours, seriously injuring Appellants and many others.

The district court granted summary judgment on a limited discovery record to all defendants on all claims. Appellants maintain this judgment was entered in error. The court improperly viewed the facts in the light most favorable to Appellees and misapplied the constitutional law of excessive force and qualified immunity. The court also made extensive determinations as to disputed facts, usurping the role of the jury as factfinder, and premised its rulings on these determinations. A jury must determine whether the force used by law enforcement was objectively unreasonable; whether the individual Appellees are liable as supervisors; and whether the entity Appellees under *Monell*.

## REQUEST FOR ORAL ARGUMENT

Appellants respectfully request 20 minutes oral argument to adequately address the multiple issues and parties.

# TABLE OF CONTENTS

Page

SUMMARY OF THE CASE ...........................................................i

REQUEST FOR ORAL ARGUMENT ....................................i

TABLE OF CONTENTS ...............................................................ii

TABLE OF AUTHORITIES ..........................................................v

APPELLANT'S BRIEF ................................................................ 1

JURISDICTIONAL STATEMENT ..................................... 1

STATEMENT OF ISSUES ................................................. 1

I. The District Court failed to consider the evidence in the light most favorable to Appellants, the non-movants, on summary judgment. ...................................................... 1

II. Law enforcement Appellees' use of force on Appellants was not objectively reasonable in violation of the Fourth and Fourteenth Amendments to the Constitution. ......... 1

A. Law Enforcement seized Appellants under the Fourth Amendment when striking them with impact munitions and freezing water.................................. 1

B. Appellants are also protected from excessive force by the Fourteenth Amendment. ................................ 2

C. A reasonable jury could find that Appellees' force used against Appellants was objectively unreasonable ............ 2

III. Appellees are not entitled to qualified immunity........................ 2

IV. Individual Appellees have supervisory liability and entities are liable pursuant to *Monell* ........................................ 2

A. Appellee supervisors had opportunity and failed to intervene. 3

B. Entities failed to train and supervise ....................................... 3

C. Entities liable through acts of policymakers ............................ 3

STATEMENT OF THE CASE ........................................................... 4

A. Procedural History ................................................................... 4

B. A Historic Call for the Exercise of First Amendment Rights ... 4

C. DAPL Permit Halted While Law Enforcement
Aggression Increases................................................................5

D. November 20–21, 2016: Evidence Disputing Whether
Appellants' Presence South of the Barricade Was Unlawful....6

E. Appellants and Others Gather on November 20, 2016 .............7

F. Evidence Disputing That Appellants Received Notice,
Warning and Opportunity to Leave Prior to Being
Subjected to Force ....................................................................9

G. Evidence Disputing That Appellants Presented a
Threat Justifying Use of Force ...............................................10

H. Law Enforcement Was Not Overrun by Water Protectors .....13

I. Appellees Used a High Level of Force
Indiscriminately on All Present on the Bridge........................14

J. Law Enforcement Force Caused Serious Injuries ...................17

   1. Appellant Dundon Shot in Eye Requiring Multiple
Surgeries..............................................................................17

   2. Appellant Demo Shot in Hand Requiring Surgery .............18

   3. Appellant Dullknife Shot in Chest, Stomach and Leg.........19

   4. Appellant Finan Shot in Abdomen......................................19

   5. Appellant Bruce Shot in Genitals .......................................20

   6. Appellant Wilson Shot in Chest ..........................................20

K. Disputed Facts Show Supervisors Kirchmeier, Ziegler
and Kaiser Are Liable .............................................................21

L. Disputed Facts Show Shooting Occurred without
Supervision or Training ..........................................................22

M. Conclusions of Police Practices Expert Frazier ......................22

SUMMARY OF ARGUMENT ..........................................................24

ARGUMENT ....................................................................................26

I. STANDARD OF REVIEW .........................................................26

II. The District Court Erred in Failing to Consider the
Evidence in Light Most Favorable to Appellants. ......................26

III. A Jury Must Determine Whether the Force Used
Against Appellants was Objectively Unreasonable....................33

    A.   Law Enforcement Seized Each Appellant under the Fourth Amendment the Moment They Shot Them With Impact Munitions and Freezing Water .......................... 33

    B.   A Jury Should Decide the Reasonableness of the Use of Force. ...................................................................... 39

        1.   Severity of Crime at Issue ...................................... 41

        2.   No Active Resistance, Attempts to Flee or Immediate Threat to Safety of Officers or Others .............. 45

        3.   Other Factors: Warnings and Extent of Injury .................... 47

IV.   Alternatively, Appellants Are Protected From Unreasonable Force by the Fourteenth Amendment ................. 50

V.   Defendants Are Not Entitled to Qualified Immunity ................ 50

    A.   Standard of Review ...................................................... 50

    B.   Clearly Established Right to Be Free From Excessive Force . 51

VI.   A Jury Must Determine Whether Defendants Have Supervisory Liability or Liability Pursuant to *Monell* .............. 53

    A.   Defendant Supervisors Were Direct Participants and Failed to Intervene ................................................................. 53

    B.   A Jury Could Find the Government Entities Liable Under *Monell* ...................................................................... 55

        1.   Acts of Policy Makers.............................................. 56

        2.   Policy Failure to Train and Supervise ................................. 57

    CONCLUSION ........................................................................ 58

CERTIFICATE OF COMPLIANCE ...................................................... 59

CIRCUIT RULE 28A(H) CERTIFICATION .......................................... 60

CORPORATE DISCLOSURE STATEMENT .......................................... 61

ATTORNEY'S FEES ........................................................................ 62

CERTIFICATE OF SERVICE ............................................................. 63

# TABLE OF AUTHORITIES

Page

**Cases:**

*Alsaada v. City of Columbus, Ohio*
No. 2:20-CV-3431, 2021 WL 3375834 ............................................. 34

*Alsaada v. City of Columbus*
536 F.Supp.3d 216 (S.D. Ohio 2021) ........................................... 2, 36

*Alsaada v. City of Columbus*
536 F. Supp. 3d 216 (S.D. Ohio 2021) ........................................ 34, 35

*Anderson v. City of Atlanta*
778 F.2d 678 (11th Cir. 1985) ......................................................... 56

*Ashcroft v. al–Kidd*
563 U.S. 731 (2011) ........................................................................ 37

*Atkinson v. City of Mt. View*
709 F.3d 1201 (8th Cir. 2013) ............................................... 1, 26, 37

*B.J.G. ex rel. McCray v. St. Charles City Sheriff, No.*
*4:08-CV-1178-CDP*
2010 WL 1838414 (E.D. Mo 2010) ................................................. 53

*B.J.G. ex rel McCray v. St. Charles City Sheriff*
400 F.App'x 127 (8th. Cir. 2010) .................................................... 53

*Banks v. Hawkins, 999 F.3d 521, 528 n. 6 (8th Cir. 2021)(citing*
*Brown v. City of Golden Valley*
574 F.3d 491 (8th Cir. 2009) .......................................................... 47

*Banks v. Hawkins*
999 F.3d 521 (8th Cir. 2021) ............................................... 2, 42, 47

*Barham v. Ramsey*
434 F.3d 565 (D.C.Cir. 2006) ................................................... 43, 45

*Baude v. City of St. Louis*
476 F. Supp. 3d 900 (E.D. Mo. 2020) ...................................... 3, 40, 44

*Baude v. Leyshock*
23 F.4th 1065 (8th Cir. 2022) ................................................. passim

*Bd. of Comm'rs of Bryan Cnty. v. Brown*
520 U.S. 397 (1997) ........................................................... 56

*Bernini v. City of St. Paul*
665 F.3d 997 (8th Cir. 2012) ........................................... 44

*Black Lives Matter D.C. v. Trump*
544 F.Supp.3d 15 (D.D.C. 2021) ..................................... 38

*Brendlin v. California*
551 U.S. 249 (2007) ......................................................... 37

*Buck v. City of Albuquerque*
2007 WL 9734037 (D.N.M. Apr. 11, 2017) ..................... 38

*California v. Hodari D.*
499 U.S. 621 (1991) .................................................... 34, 35

*Canton v. Harris*
489 U.S. 378 (1989) ................................................ 3, 55, 57

*City of St. Louis v. Praprotnik*
485 U.S. 112 (1988) ......................................................... 56

*Claiborne Hardware v. NAACP*
458 U.S. 886 (1982) ......................................................... 43

*Coles v. City of Oakland*
No. C03–2961 TEH, 2005 WL 8177790 (N.D. Cal. Apr. 27,
2005) ................................................................................. 36

*Cty of Sacramento v. Lewis*
523 U.S. 833 (1998) ......................................................... 50

*Deorle v. Rutherford*
272 F.3d 1272 (9th Cir. 2001) ........................................ 48

*Edrei v. Maguire*
892 F.3d 525 (2d Cir. 2018) ........................................... 50

*Fogarty v. Gallegos*
523 F.3d 1147 (10th Cir. 2008) ...................................... 43

*Garcia v. Salt Lake Cnty.*
768 F.2d 303 (10th Cir. 1985) ........................................ 55

*Graham v. Connor*
490 U.S. 386 (1989) ..................................................... 2, 39

*Hopkins v. Andaya*
  958 F.2d 881 (9th Cir. 1992) .......................................................... 55

*Jennings v. City of Miami*
  No. 07–23008-CIV, 2009 WL 413110 (S.D. Fla. Jan. 27,
  2009) .................................................................................... 35

*Jett v. Dallas Indep. Sch. Dist.*
  491 U.S. 701 (1989) ...................................................................... 56

*Johnson v. Carroll*
  658 F.3d 819 (8th Cir. 2011) .......................................................... 52

*Johnson v. City of San Jose*
  2022 WL 799424 (N.D. Cal. 2022) ................................................... 38

*Kahle v. Leonard*
  477 F.3d 544 (8th Cir. 2007) .......................................................... 54

*Kingsley v. Hendrickson*
  576 U.S. 389 (2015) .................................................................. 2, 50

*Loch v. City of Litchfield*
  689 F.3d 961 (8th Cir. 2012) .......................................................... 48

*Mitchell v. Kirchmeier*
  28 F.4th 888 (8th Cir. 2022) .................................................. *passim*

*Molina v. City of St. Louis*
  2021 WL 1222432 (E.D. Mo. Mar. 31, 2021) ..................................... 38

*Monell v. Dep't of Soc. Servs.*
  436 U.S. 658 (1978) ...................................................... 2, 53, 55, 57

*Montoya v. City of Flandreau*
  669 F.3d 867 (8th Cir. 2012) .................................................. 49, 52

*Nance v. Sammis*
  586 F.3d 604 (8th Cir. 2009) .......................................................... 52

*Nelson v. City of Davis*
  685 F.3d 867 (9th Cir. 2012) .......................................... 2, 36, 38, 39

*Ottman v. City of Independence*
  341 F.3d 751 (8th Cir. 2003) .......................................................... 54

*Owen v. City of Independence*
  445 U.S. 622 (1980) ...................................................................... 55

*Papineau v. Parmley*
465 F.3d 46 (2d Cir. 2006) ................................................................. 43

*Pearson v. Callahan*
555 U.S. 223 (2009) ........................................................................ 51

*Procknow v. Curry*
826 F.3d 1009 (8th Cir. 2016) ........................................................ 48

*Quraishi v. St. Charles Cnty.*
986 F.3d 831 (8th Cir. 2021) ......................................................... 38

*Rauen v. City of Miami*
No. 06–21182-CIV, 2007 WL 686609 (S.D. Fla. Mar. 2, 2007) ....... 36

*Ribbey v. Cox*
222 F.3d 1040 (8th Cir. 2000) ....................................................... 47

*Saucier v. Katz*
533 U.S. 194 (2001) ........................................................................ 51

*Shannon v. Kohler*
616 F.3d 855 (8th Cir. 2010) ......................................................... 52

*Small v. McCrystal*
708 F.3d 997 (8th Cir. 2013) ......................................................... 52

*Soltesz v. Rushmore Plaza Civic Ctr.*
847 F.3d 941 (8th Cir. 2017) ..................................................... 3, 56

*Speer v. City of Wynne*
276 F.3d 980 (8th Cir. 2002) ..................................................... 3, 56

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*
40 F.Supp.3d 1 (D.D.C. 2020)
aff'd sub nom. Standing Rock Sioux Tribe v. United States
Army Corps of Engineers, 985 F.3d 1032 (D.C. Cir. 2021)
cert. denied Dakota Access, LLC v. Standing Rock Sioux
Tribe, 142 S. Ct. 1187 (2022). ..................................................... 4, 6

*Tennessee v. Garner*
471 U.S. 1 (1985) ..................................................................... 39, 40

*Tolan v. Cotton*
572 U.S. 650 (2014) ............................................................... *passim*

*Torres v. Madrid*
141 S.Ct. 989 (2021) ................................................... 1, 33, 34, 35

*Vodak v. City of Chicago*
  639 F.3d 738 (7th Cir. 2011) ........................................... 45, 56

*Wagner v. Jones*
  664 F.3d 259 (8th Cir. 2011) ........................................... 3, 54

*White v. Jackson*
  865 F.3d 1064 (8th Cir. 2017) .......................................... 39

*Whitney v. City of St. Louis, Mo*
  887 F.3d 857 (8th Cir. 2018) ........................................... 2, 50

*Whren v. United States*
  517 U.S. 806 (1996) .................................................... 37

*Williams v. City of Burlington*
  27 F.4th 1346 (8th Cir. 2022) .......................................... 2, 51

*Wilson v. Town of Mendon*
  294 F.3d 1 (1st Cir. 2002) ............................................. 55

*Ybarra v. Illinois*
  444 U.S. 85 (1979) ..................................................... 45

**Statutes:**

28 U.S.C. § 1291 ......................................................... 1

28 U.S.C. § 1331 ......................................................... 1

28 U.S.C. § 1343 ......................................................... 1

42 U.S.C. § 1983 ......................................................... 1, 53

1367 .................................................................... 1

N.D. Cent. Code § 12.1-08-01 ............................................ 41

N.D. Cent. Code § 12.1-22-03 ............................................ 41

**Constitutions:**

U.S. Const., 1st Amend. ................................................. 25, 27, 43

U.S. Const., 4th Amend. ................................................. *passim*

U.S. Const., 14th Amend. ................................................ 2, 50

**Other:**

Anna Feifenbaum, *White-washing the water cannon: salesmen, scientific experts and human rights abuses*, Open Democracy (Feb. 25, 2014) .................................................................. 49

<u>**Appellant's Brief**</u>

## JURISDICTIONAL STATEMENT

Appellants brought their action pursuant to 42 U.S.C. §1983. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343 and 1367. It entered a final order dismissing all claims on December 29, 2021. (App.1; R. Doc. 286; App.92; R. Doc. 287.) On January 28, 2022, Appellants timely filed their notice of appeal. (App.93; R. Doc. 288.) This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF ISSUES

I. **The District Court failed to consider the evidence in the light most favorable to Appellants, the non-movants, on summary judgment.**

*Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *Atkinson v. City of Mt. View*, 709 F.3d 1201, 1207 (8th Cir. 2013)

II. **Law enforcement Appellees' use of force on Appellants was not objectively reasonable in violation of the Fourth and Fourteenth Amendments to the Constitution.**

A. **Law Enforcement seized Appellants under the Fourth Amendment when striking them with impact munitions and freezing water.**

*Torres v. Madrid*, 141 S.Ct. 989 (2021)

*Atkinson v. City of Mt. View,* 709 F.3d 1201 (8th Cir. 2013)

1

*Alsaada v. City of Columbus*, 536 F.Supp.3d 216, 262–263 (S.D. Ohio 2021)

*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012)

**B. Appellants are also protected from excessive force by the Fourteenth Amendment.**

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015)

*Whitney v. City of St. Louis, Mo*, 887 F.3d 857 (8th Cir. 2018)

**C. A reasonable jury could find that Appellees' force used against Appellants was objectively unreasonable**

*Graham v. Connor*, 490 U.S. 386 (1989)

*Banks v. Hawkins*, 999 F.3d 521 (8th Cir. 2021)

**III. Appellees are not entitled to qualified immunity**

*Williams v. City of Burlington*, 27 F.4th 1346 (8th Cir. 2022)

*Mitchell v. Kirchmeier*, 28 F.4th 888 (8th Cir. 2022)

*Baude v. Leyshock*, 23 F.4th 1065 (8th Cir. 2022)

**IV. Individual Appellees have supervisory liability and entities are liable pursuant to *Monell***

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)

**A. Appellee supervisors had opportunity and failed to intervene**

*Baude v. Leyshock*, 23 F.4th 1065 (8th Cir. 2022)

*Baude v. City of St. Louis,* 476 F.Supp.3d 900 (E.D. Mo. 2020)

*Wagner v. Jones*, 664 F.3d 259 (8th Cir. 2011)

**B. Entities failed to train and supervise**

*Canton v. Harris*, 489 U.S. 378 (1989)

**C. Entities liable through acts of policymakers**

*Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941 (8th Cir. 2017)

*Speer v. City of Wynne*, 276 F.3d 980 (8th Cir. 2002)

**STATEMENT OF THE CASE**

### A. Procedural History

Appellants appeal from the district court's order granting summary judgment in favor of all Appellees and dismissing Appellants' complaint in its entirety. (App.1–92; R. Doc. 286–287.) Appellees initially filed a motion to dismiss that the court converted to a summary judgment motion after allowing only limited discovery. (App.510; R. Doc. 154.)

### B. A Historic Call for the Exercise of First Amendment Rights

In August 2016, the Standing Rock Sioux Tribe put out a call for people to join them in peaceful prayer and protest to protect the water of the Missouri River and sacred, historic and cultural sites imperiled by the construction of the Dakota Access Pipeline (DAPL).[1] (App.1673 at ¶¶5–13; R. Doc. 269.) People from over 300 Indigenous Nations and supporters from around the world heeded the call and gathered at Standing Rock in prayer-based camps, calling themselves water

---

[1]   The Standing Rock, Cheyenne River, and other Sioux Tribes prevailed in their litigation to strike down the permits for the Dakota Access Pipeline. The Court found the Army Corps of Engineers violated the National Environmental Policy Act by failing to adequately consider the likelihood and impact of an oil spill on the Tribes. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 40 F.Supp.3d 1 (D.D.C. 2020) aff'd sub nom. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032 (D.C. Cir. 2021) cert. denied *Dakota Access, LLC v. Standing Rock Sioux Tribe*, 142 S. Ct. 1187 (2022).

protectors. (App.1673 at ¶¶3–16; R. Doc. 269.)

### C. DAPL Permit Halted While Law Enforcement Aggression Increases

In September 2016, the federal government halted DAPL's permitting process for the Missouri River crossing and requested that DAPL cease all construction within 20 miles of Lake Oahe[2]. As of November 20, there was no construction occurring. (App.1673 at ¶18; R. Doc. 269; App.977; R. Doc. 239–14.)

The law enforcement response to water protectors was increasingly violent and entailed hundreds of wrongful arrests from August to November 20, 2016, although the protests remained largely peaceful. (App.130; R. Doc. 14–9; App.381–2; R. Doc. 81–3; App.410; R. Doc. 81–11; App.419; R. Doc. 81–14; App.440; R. Doc. 81–20; App.505; R. Doc. 81–29; App.1677 at ¶14–17,19; R. Doc. 269). Of the eventual total of more than 800 arrests, little more than a handful resulted in convictions. (App.1677 at ¶19; R. Doc. 269; App.94–287; R. Doc. 14–1-14–20). No injuries to law enforcement were reported during this period. (App.4–7 at ¶6–14; R. Doc. 286.)

---

[2] Lake Oahe is the dammed portion of the Missouri River where DAPL crosses.

### D. November 20–21, 2016: Evidence Disputing Whether Appellants' Presence South of the Barricade Was Unlawful

The U.S. Army Corps of Engineers granted the Standing Rock Sioux Tribe a permit for the prayer camp on federal land, just south of the Backwater Bridge, and this permit was in effect on November 20, 2016. (App.369; R. Doc. 61–9; App.1676; R. Doc. 269.) The bridge is on unceded Sioux land, and under federal law, the Tribe retains property interests in the waters of the Missouri River and in its historic and cultural sites. (App.596–7; R. Doc. 239–1; App.1674–5; R. Doc. 269; App.1517–8; R. Doc. 266; App.1519–20; R. Doc. 266–1; and see *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 40 F.Supp.3d 1.)

In October 2016, law enforcement set up a barricade at the north end of the Backwater Bridge. The barricade consisted of two rows of concrete barriers 12 to 15 feet apart with two rows of concertina wire between them and another row of concertina wire stacked on top. Two burned out trucks were chained to the concrete barrier with large log chains on the south side of the barricade. (App.13–14 at ¶31; R. Doc. 286.) At some point, "No Trespassing" signs were placed north of and behind the concertina wire. While the road was closed to vehicular traffic, there was no signage or blockade giving notice that pedestrians were not allowed on the bridge or roadway south of the barricade. (App.469–70; R. Doc. 81–27; App.540–42,545–547,598; R. Doc. 239–1;

App.635–36; R. Doc. 239–4; App.724; R. Doc. 239–7; App.755–56,760; R. Doc. 239–8; App.822; R. Doc. 239–9; App.834; R. Doc. 239–10; App.983; R. Doc. 239–14; App.1043; R. Doc. 239–15; App.1311; R. Doc. 239–16; App.1540–52; R. Doc. 266–5; App.1585,1617; R. Doc. 266–6; App.1677–78; R. Doc. 269; App.1703; R. Doc. 273–7.)

### E. Appellants and Others Gather on November 20, 2016

On November 20th into the morning of November 21, 2016, individuals gathered at the Bridge praying and peacefully protesting to express their opinions about DAPL. (App.1171–2; R. Doc. 239.16.) There were no DAPL workers or civilians present whose safety was threatened by the water protectors, and no construction occurring that could be disrupted. (App.977; R. Doc. 239–14; App.1677; R. Doc. 269.) A single individual tried to climb over the concertina wire and was immediately arrested early in the evening. (App.651–652; R. Doc. 275; App.758–9; R. Doc. 239–8; App.851,887, 896; R. Doc. 239–10; App.1064–5; R. Doc. 239–15; App.1386,1404; R. Doc. 239–16.) Throughout the incident, Appellants were located south of the barricade and at no time breached the barricade. *Id.* According to the Incident Commander, Defendant Kaiser, individuals could legally protest on the south side of the Bridge off the bridge deck. (App.986; R. Doc. 239–14.) Law enforcement stayed north of the barricade, and never crossed south. (App.554–56,558,561–63,577–78, 593; R. Doc. 239–1.)

7

The two "no trespassing" signs were behind the barricade and off to the sides, on the embankment below the level of the bridge. They were not visible looking straight north at the barricade from the road. There was no other indication that people were not allowed on the bridge or impediment to walking, until the barricade north end of the bridge. (App.983 at 84; R. Doc. 239–14; App.1585; R. Doc. 266–6; App.1678¶21; R. Doc. 269; and see App.471; R. Doc. 81–27; App.1617; R. Doc. 266–6.) In fact in the weeks prior, law enforcement had allowed pedestrians to walk on the bridge. (App.540 at 95, 546–7, 598; R. Doc. 239–1; App.755–6,774; R. Doc. 239–8; App.469–70; R. Doc. 81–27; App.1673; R. Doc. 269.) Appellants, and many other water protectors, never saw the signs. (App.471,473–4; R. Doc. 81–27; App.542; R. Doc. 239–1; App.635–6; R. Doc. 239–4; App.724; R. Doc. 239–7; App.760; R. Doc. 239–8; App.1703; R. Doc. 273–5.) Pedestrians were allowed on the Bridge south of the barricade and the barricade stopped anyone from going north of the Bridge. (App.471; R. Doc. 81–27; App.546–7,598; R. Doc. 239–1; App.755–6,774; R. Doc. 239–8; App.822; R. Doc. 239–9; App.1617; R. Doc. 266–6; App.1678; R. Doc. 269; App.1703; R. Doc. 273–7.) At least one of the two signs was taken down by law enforcement sometime during the November 20–21 event. (App.1703; R. Doc. 273–6-7.)

### F. Evidence Disputing That Appellants Received Notice, Warning and Opportunity to Leave Prior to Being Subjected to Force

Although Appellees claim to have given numerous – "hundreds" – of amplified dispersal announcements during the night, this is refuted by the extensive video and audio evidence, Appellants' testimony, and declarations of numerous witnesses including water protectors, medical personnel and attorneys acting as legal observers. Contrary to standard law enforcement practice, Appellees have no documentation or record of any such announcements. According to one of the legal observers, there was a single amplified announcement to the crowd early in the evening on November 20th, that was hard to make out, but it was never repeated. (App.1383; R. Doc. 239–16; App.1670; R. Doc. 267; App.835–6; R. Doc. 239–10; App.1669–71; R. Doc. 267; App.449–50; R. Doc. 81–23; App.1686–7; R. Doc. 270; App.892; R. Doc. 239–10; App.1383; R. Doc. 239–16; App.379; R. Doc. 81–2; App.383; R. Doc. 81–3; App.385–386; R. Doc. 81–4; App.391; R. Doc. 81–6; App.416; R. Doc. 81–12; App.426; R. Doc. 81–16; App.443–4; R. Doc. 81–21; App.1679; R. Doc. 269; App.464; R. Doc. 81–25; App.502–503; R. Doc. 81–28; App.449–51; R. Doc. 81–23.) The Long Range Acoustic Device (LRAD) Appellees claim to have used to make audible announcements was broken, or stopped working, at some point that night. (App.1523–6; R. Doc. 266–3; App.1041 at 98; R. Doc. 239–15.) Although law enforcement also had a PA it was not as

9

loud. (App.1031 at 57–8; R. Doc. 239–15.)

One notice or directive given at an earlier point in the evening to whomever was present at that time cannot constitute effective notice or directive to hundreds of other persons who arrived at other points in time during ensuing hours. Appellants did not hear warnings, particular orders or directives from law enforcement and notably, Appellees have no information or evidence that warnings were given such that they were calculated to be heard by the Appellants. (App.1430–31; R. Doc. 239–16; App.903; R. Doc. 239–10; App.634; R. Doc. 239–4; App.771, 783–4, 788; R. Doc. 239–8; App.534; R. Doc. 239–1; App.379; R. Doc. 81–2; App.383; R. Doc. 81–3; App.385–6; R. Doc. 81–4; App.389; R. Doc. 81–5; App.391; R. Doc. 81–6; App.414; R. Doc. 81–12; App.444; R. Doc. 81–21; App.464–5; R. Doc. 81–25; App.451; R. Doc. 81–23; App.472–3,475,478,488; R. Doc. 81–27; App.973; R. Doc. 239–14.)

## G. Evidence Disputing That Appellants Presented a Threat Justifying Use of Force

Appellants did not throw anything at law enforcement officers or threaten law enforcement in any way. (Defendants' depositions at App.1336–7,1410,1439; R. Doc. 239–16; App.885, 895, 899, 916; R. Doc. 239–10; App.989; R. Doc. 239–14; App.1074; R. Doc. 239–15.) Eyewitnesses and over 200 hours of video evidence overwhelmingly depicts peaceful protestors and a lack of widespread aggressive activity,

nor does it show any large group attempting to breach the barricade, or the crowd acting as a unit to break through the barricade. (App.131; R. Doc. 14–9; App.376,380; R. Doc. 81–2; App.385; R. Doc. 81–4; App.388; R. Doc. 81–5; App.416; R. Doc. 81–12; App.418; R. Doc. 81–13; App.420; R. Doc. 81–14; App.426; R. Doc. 81–16; App.429; R. Doc. 81–17; App.431–2; R. Doc. 81–18; App.443; R. Doc. 81–21; App.450–2; R. Doc. 81–23; App.457; R. Doc. 81–24; App.462; R. Doc. 81–25; App.466–7; R. Doc. 81–26; App.475–77, 494; R. Doc. 81–27; App.499,503; R. Doc. 81–28; App.972,994; R. Doc. 239–14; App.888,897; R. Doc. 239–10; App.1392; R. Doc. 239–16; App.1672–2; R. Doc. 267; App.1703; R. Doc. 273.) While a small number of people tried to tow the burned trucks away from the barricade in a discrete incident early in the evening, the video evidence and testimony show that most of the crowd remained a distance away from the barricade, engaged in peaceful activity such as praying, singing, photographing, expressing themselves verbally, or simply standing for various portions of that evening. (App.131; R. Doc.14–9; App.376,380; R. Doc. 81–2; App.385; R. Doc. 81–4; App.388; R. Doc. 81–5; App.416; R. Doc. 81–12; App.418; R. Doc. 81–13; App.419–20; R. Doc. 81–14; App.426; R. Doc. 81–16; App.429; R. Doc. 81–17; App.431–2; R. Doc. 81–18; App.443–4; R. Doc. 81–21; App.450–452; R. Doc. 81–23; App.457; R. Doc. 81–24; App.462; R. Doc. 81–25; App.466–7; R. Doc. 81–26; App.475–77,494; R. Doc. 81–27; App.499, 503; R. Doc. 81–28; App.994; R. Doc. 239–14; App.1672–2; R.

11

Doc. 267.) Moreover, the truck towing incident occurred well prior to most of the water protectors, including most of the Appellants, even being physically present on the bridge, and no Appellant participated in trying to tow the trucks or otherwise interfere with the barricade.

The fires that appeared that night were not meant to provoke or threaten, some were in fact set by the implosive devices launched by law enforcement and others set to warm the water protectors and mitigate the effects of the water freezing clothes solid. (E.g.; App.469–70,481,491,493–94; R. Doc. 81–27.)

In over 200 hours of video evidence, no logs or large objects are seen being thrown and no more than ten individuals can be seen throwing munitions fired by law enforcement back in the general direction of the multi-layered barricade. (App.1671; R. Doc. 267; App.1; R. Doc. 286.) There is no documentation of what time an item was allegedly thrown at law enforcement or the number of items claimed to have been thrown, and – as acknowledged by both of the government entity defendants and the Lieutenant in command at the scene – no such items were photographed or collected for evidence. (App.891; R. Doc. 239–10; App.1070; R. Doc. 239–15; App.1362; R. Doc. 239–16.) Appellee Morton County released a statement to the press including photographs of items for which there was no evidence the items were thrown by water protectors and claims regarding water protectors having "Improvised Explosive Devices" later shown to be false. (App.288–368;

R. Doc. 61–3; App.1629,1631; R. Doc. 266–6; App.1704–21.)

## H.  Law Enforcement Was Not Overrun by Water Protectors

There were up to 500 water protectors at the Bridge and up to 350 law enforcement officers, who were stationed behind and protected by the multi-layered barricade, their equipment and numerous vehicles. (App.1065; R. Doc. 239–15; App.1685–6; R. Doc. 270; App.1540–1552; R. Doc. 66–5.) Appellees admit that not everyone in the crowd was even allegedly involved in riot-type behavior. (App.888, 897; R. Doc. 239–10.) Defendant Morton County claims only a single officer was struck with an object during the entire event and there is no report that any highway patrol officer hit with an object was hurt or required medical attention. (App.848; R. Doc. 239–10; App.1487; R. Doc. 241; App.1503–4; R. Doc. 242; App.1495; R. Doc. 241–1; App.1510–11; R. Doc. 243; App.971,989; R. Doc. 239–14.)

There were only a small number of persons present on the bridge on November 20–21 whose acts involved challenges to law enforcement authority. The officers were well protected behind their barricade, and the area north of the barricade was under their control; it would have been virtually impossible for water protectors to cross and indeed no one attempted to cross, save one person. Retired Police Commissioner Thomas Frazier concluded that law enforcement's fear and

characterization of the November 20–21 event as a riot was "overstated and inaccurate." (App.1685–6; R. Doc. 275; App.1678–9; R. Doc. 269.) The chaos and violence of that night was caused and carried out by law enforcement, not by water protectors.

## I. Appellees Used a High Level of Force Indiscriminately on All Present on the Bridge

Law Enforcement reported continuously shooting and using numerous rounds, including stinger grenades, shotgun beanbag rounds and other impact munitions, as well as chemical agent devices, expending all of their munitions by the time the officers left the area. Law enforcement shot rubber bullets, exploding munitions and water indiscriminately and without provocation into the crowd, reaching even those who were far south of the barricade and could not possibly pose any threat. Beanbags and other impact munitions are highly dangerous weapons which should never be used indiscriminately in a crowd, as the video evidence shows they were here, striking peaceful people, some standing still near the barricade, some far from the barricade and some walking away. (App.109¶15; R. Doc. 14–3; App.121¶8; R. Doc. 14–6; App.184 ¶¶17–8; R. Doc. 14–19; App.379; R. Doc. 81–2; App.381; R. Doc. 81–3; App.385; R. Doc. 81–4; App.392; R. Doc. 81–6; App.393¶15; R. Doc. 81–6; App.394¶¶4,6; R. Doc. 81–7; App.403¶14; R. Doc. 81–9; App.417–8¶7; R. Doc. 81–13; App.429–30; R. Doc. 81–17; App.432–3; R.

Doc. 81–18; App.433¶¶17,21; R. Doc. 81–18; App.436–7¶¶9–10; R. Doc. 81–19; App.443–4¶5; R. Doc. 81–21; App.447¶3; R. Doc. 81.22; App.451–2; R. Doc. 81–23; App.456; R. Doc. 81–24; App.462–4; R. Doc. 81–25; App.467; R. Doc. 81–26; App.478, 483; R. Doc. 81–27; App.501–2; R. Doc. 81–28; App.502¶9; R. Doc. 81–28; App.509; R. Doc. 100; App.515 at 33, 576 at 237–8, 581 at 258, 584 at 270–2; R. Doc. 239–1; App.600; R. Doc. 239–2; App.618 at 63, 622 at 76, 632 at 118, 633 at 120, 653 at 202; R. Doc. 239–4; App.888–9; R. Doc. 239–10; App.976; R. Doc. 239–14; App.1365; R. Doc. 239–16; App.1495–1502; R. Doc. 241–1; App.1527–1539; R. Doc. 266–4; App.1691–2; R. Doc. 270; App.1703; R. Doc. 273–1-4; App.1704–9.) This barrage of munitions and water went on from 6:00 p.m. on November 20th through at least 2:00 a.m. on November 21st. There was no basis to assume that any of the individuals who were hit had heard any orders to leave, or had engaged in unlawful activity that ostensibly justified the use of force. (App.888–9, 893; R. Doc. 239–10; App.1365; R. Doc. 239–16; App.1495–1502; R. Doc. 241–1; App.1527–39; R. Doc. 266–4; App.1690,1693; R. Doc. 270.)

The high pressure firefighting equipment misused by Law Enforcement on human bodies, including those of Appellants, was powerful enough to knock walls down. Two of these water cannons were used simultaneously on the crowd, including on those engaged in praying, singing, crying, talking to the police, and not doing anything

aggressive or threatening. The spray of the water knocked people off their feet or spun them around. (App.377; R. Doc. 81–2; App.384; R. Doc. 81–3; App.386; R. Doc. 81–4; App.388–9; R. Doc. 81–5; App.391; R. Doc. 81–6; App.433–4; R. Doc. 81–21; App.450; R. Doc. 81–23; App.462; R. Doc. 81–25; App.503; R. Doc. 81–28; App.508; R. Doc. 92–2; App.509; R. Doc. 100; App.635, 659; R. Doc. 239–4; App.1703; R. Doc. 273–5; App.1690–1; R. Doc. 270; App.451; R. Doc. 81–23.) The temperature was in the low teens or twenties, and the water formed ice on the Bridge and on individuals struck with the water. (App.628; R. Doc. 239–4; App.796; R. Doc. 239–8; App.905; R. Doc. 239–10; App.995; R. Doc. 239–14; App.1500–1; R. Doc. 241–1). The brute force of the impact of the water used in sub-freezing temperatures served no reasonable law enforcement purpose. (App.377; R. Doc. 81–2; App.384; R. Doc. 81–3; App.386; R. Doc. 81–4; App.388; R. Doc. 81–5; App.391–2; R. Doc. 81–6; App.443–4; R. Doc. 81–21; App.450–2; R. Doc. 81–23; App.456; R. Doc. 81–24; App.462–3; R. Doc. 81–25; App.467; R. Doc. 81–26; App.483; R. Doc. 81–27; App.500–1; R. Doc. 81–28; App.508; R. Doc. 92–1; App.509; R. Doc. 100; App.1690–2; R. Doc. 270; App.628, 635, 659; R. Doc. 239–4; App.796; R. Doc. 239–8; App.905; R. Doc. 239–10; App.976, 995; R. Doc. 239–14; App.1502; R. Doc. 241–1; App.1703, Ex. 5 at 2:33–3:57, 4:32–5:10; R. Doc. 273–5.)

## J. Law Enforcement Force Caused Serious Injuries

Medical personnel on site treated approximately 300 water protectors who were injured by law enforcement over the course of the night, including at least 26 seriously injured people who were evacuated by ambulance to area hospitals. (App.1697–99; R. Doc. 271; App.447–48; R. Doc. 81–22; App.400–05; R. Doc. 81–9; App.417 at ¶ 6; R. Doc. 81–13; App.600; R. Doc. 239–2.)

### 1. Appellant Dundon Shot in Eye Requiring Multiple Surgeries

Vanessa Dundon responded to a cry for help from the Bridge and began smudging sage and cedar to protect individuals from harm. (App.554–55, 558, 561; R. Doc. 239–1.) She never saw a no trespassing sign on the Bridge and heard no orders, directives or warnings. (App.534; R. Doc. 239–1; *see also* App.771, 783–84, 788; R. Doc. 239–8; App.634; R. Doc. 239–4; App.379 at ¶26; R. Doc. 81–2; App.383 at ¶13; R. Doc. 81–3; App.385–86 at ¶¶7,18; R. Doc. 81–4; App.389 at ¶ 5; R. Doc. 81–5; App.391 at ¶ 6; R. Doc. 81–6; App.415 at ¶ 2; R. Doc. 81–12; App.444 at ¶ 6; R. Doc. 81–21; App.464 at ¶ 19; R. Doc. 81–25; App.451 at ¶ 13; R. Doc. 81–23; App. 472–73, 475, 478, 488; R. Doc. 81–27.) As she observed the barricade, law enforcement shot a flaming projectile directly at her face. (App.182 at ¶7; R. Doc. 14–19.) Having no warning or time to move, she was struck in the right eye with enough force to

knock her down to the ground. (App.183 at ¶8–9; R. Doc. 14–19.) As she attempted to run away she was shot in the back of her leg with a rubber bullet, again knocking her down as her eye was bleeding. (App.183 at ¶ 10; R. Doc. 14–19; *see also* App.150; R. Doc. 14–14; App.394; R. Doc. 81–7; App.461, 463–64; R. Doc. 81–25; App.1704–12.) The injury to her eye caused extreme pain, a detached retina, loss of vision and required her to undergo multiple surgeries. (App.184 at ¶¶17–18; R. Doc. 14–19, *see also* App.525, 576, 581, 584; R. Doc. 239–1; App.618, 622, 632–33, 653; R. Doc. 239–4.)

### 2. Appellant Demo Shot in Hand Requiring Surgery

David Demo went to the Bridge to peacefully protest and videotape police brutality but did not arrive until after 8:30 p.m. (App.173 at ¶6; R. Doc. 14–17.) Within minutes, law enforcement blasted him with freezing water forceful enough to spin him around and impede his ability to walk away. (*Id.* at ¶7; *see also* App.635, 659; R. Doc. 239–4.) Approximately 30 seconds later, law enforcement shot him with a rubber bullet in his hand that was holding up his GoPro camera; immediately causing him intense, excruciating pain. (App.173 at ¶7; R. Doc. 14–17; App.632–33; R. Doc. 239–4.) The injury caused a compound fracture requiring reconstructive surgery. (App.618, 622, 632–33, 653; R. Doc. 239–4; *see also* App.184 at ¶¶ 17–18; R. Doc. 14–19; App.525, 576, 581, 584; R. Doc. 239–1.) The surgeon reported having to remove

bits of rubber from the wound. (App.622; R. Doc. 239–4.)

### 3. Appellant Dullknife Shot in Chest, Stomach and Leg

Guy Dullknife III arrived at the Bridge sometime after 10:00 p.m. (App.145 at ¶8; R. Doc. 14–13.) After seeing an elderly woman who was kneeling and praying knocked down by the water cannon, he held up a board to protect her as she continued to pray, when law enforcement shot him with a rubber bullet and four bean bag rounds. (*Id.*) He suffered bruises to his chest, stomach and leg as a result. (*Id.*) He observed many people being shot and injured and law enforcement officers laughing and celebrating after they hit their targets. (App.146 at ¶10; R. Doc. 14–13; *see also* App.162; R. Doc. 14–15; App.724; R. Doc. 239–7; App.377–80; R. Doc. 81–2; App.1704–12.)

### 4. Appellant Finan Shot in Abdomen

When 67 year old Frank Finan arrived at the Bridge around 11:10 p.m. he was shot by law enforcement as he raised his camera and began taking photographs. (App.161 at ¶13; R. Doc. 14–15.) The shot to his left abdomen about his waistline knocked him down and he slid along the icy ground. (*Id.* at ¶14.)

### 5. Appellant Bruce Shot in Genitals

Mariah Marie Bruce was 21 years old when she went to the bridge that evening to peacefully protest. (App.130–32 at ¶1, 6, 7–11, 13–15, 19; R. Doc. 14–9.) She was sprayed with freezing water causing her hair and skirt to freeze. (*Id.* at ¶7–11.) She suffered the effects of tear gas. (*Id.* at ¶13.) When she bent down, a law enforcement officer shot her from behind with a flash bang grenade that struck her genitalia and exploded, causing her extreme pain and to vomit. (*Id.* at ¶14–15, 19.) She worries about whether this will affect her ability to have children. (*Id.* at ¶ 22.)

### 6. Appellant Wilson Shot in Chest

Crystal Wilson went to the Bridge to peacefully gather and engaged in prayer, was unarmed and not threatening law enforcement. (App.160–70 at ¶10–11; R. Doc. 14–16.) Observing an elder who was singing being sprayed with freezing water, she held up a piece of plastic to shield those behind her, and was sprayed with the water cannon, causing ice on her hair and back. (*Id.* at ¶12.) Then law enforcement shot her in the chest with an impact munition. (*Id.*) Wilson never heard a dispersal order either before or after being shot, gassed and soaked with water, and observed law enforcement continuously shooting tear gas canisters, flash bang grenades and other riot weapons at the water

protectors. (App.171 at ¶14; R. Doc. 14–16.)

### K. Disputed Facts Show Supervisors Kirchmeier, Ziegler and Kaiser Are Liable

Defendants Morton County Sheriff Kirchmeier, City of Mandan Police Chief Ziegler and Stutsman County Sheriff Kaiser were supervisors and policy makers for the law enforcement response to water protectors on November 20–21, 2016. (App.1482–84; R. Doc. 239–17; App.1485; R. Doc. 239–18; App.1690–93; R. Doc. 270.) Kirchmeier was the "overall incident commander," Kaiser was the on-scene incident commander and Ziegler was part of the unified command and all were final decision makers. (*Id.*; *see also* App.996; R. Doc. 239–14.) All officers present at the Bridge reported to Kaiser, who reported to Ziegler, who reported to Kirchmeier. (App.1693–94; R. Doc. 270; *see also* App.1722–95.)

No supervisor intervened in any use of force or tried to stop any law enforcement officer from using force on November 20–21, 2016. (App.1596 at 157, 1599 at 171–2; R. Doc. 266–6; App. 211; R. Doc. 239–16.) In fact, the decision to use water as force was made by Kaiser in consultation with command. (App. 1065 at 193; R. Doc. 239–15; App. 996 at 137–8; R. Doc. 239–14; App. 905–6 at 320–1; R. Doc. 239–10.)

## L. Disputed Facts Show Shooting Occurred without Supervision or Training

Individual officers indiscriminately used force at their own discretion without training, supervision or specific policy guidelines, as the only orders were to arrest anyone who tried to cross the barricade. (App.900–902, 906, 913; R. Doc. 239–10; App.990; R. Doc. 239–14; App.1024, 1027, 1032 1071; R. Doc. 239–15; App.1308, 1320, 1324–25; R. Doc. 239–16; App.1689, 1691; R. Doc. 270.)

Despite the fact that water protectors had been engaging in protest in the area since April 2016, with greater numbers beginning to arrive in August, the Appellees provided officers no training in providing orders to disperse, or in the use of force in a crowd or demonstration context, or particular to weapons that are indiscriminate in nature, including gas and water. (App.1595; R. Doc. 266–6; App.900–902, 906; R. Doc. 239–10; App.1024, 1026–27, 1032; R. Doc. 239–15; App.1308, 1320, 1324–25; R. Doc. 239–16.) Proper training in the use of impact munitions requires that officers aim weapons to avoid striking the head, chest and groin areas of targets and the fact of multiple injuries to these areas of the body reported by water protectors indicates inadequate training. (App.1689, 1694–96; R. Doc. 270.)

## M. Conclusions of Police Practices Expert Frazier

Retired Police Commissioner Thomas C. Frazier concluded, based on

reviewing a substantial amount of the evidence in this case: "It appears that the untrained Law Enforcement officers shot indiscriminately at protesters with no attempt to distinguish which persons were a threat to Law Enforcement and which part of their .body they hit. This could easily have resulted in fatalities." (App.1689; R. Doc. 270)

"It is inappropriate and excessive force to shoot beanbag rounds, or to launch rubber bullets ... into a crowd for the purpose of crowd dispersal. Launched munitions, including explosive grenades and chemical agent canisters which are indiscriminate in nature, ...landed in the farthest reaches of the crowd, as shown by the video evidence. This injured persons who were clearly not advancing on the police. ...[I]ndividuals outside any zone or area that could even remotely be considered to be directly confrontational to law enforcement ... were subject to serious bodily injury.... ¶The brute force of the impact of water jets is a force option that would not be considered appropriate by most modern police chiefs or sheriffs,and not tolerated by their citizenry. . . . This use of water in these temperatures was clearly intentional and punitive, and unnecessary on the part of the law enforcement decision makers. It was cruel and inhumane." (App.1692–1693; R. Doc. 270.)

## SUMMARY OF ARGUMENT

Appellants responded to a historic call to express opposition to the construction of a pipeline that would endanger water sources and indigenous land and sacred sites. On November 20-21, 2016, hundreds of law enforcement officers, protected by a barricade and their weapons engaged in a ten hour siege against nonviolent, unarmed Indigenous-led water protectors, shooting Appellants and others in a crowd with impact munitions and blasts of freezing water. The district court below, in granting summary judgment to the Appellees, failed to consider the evidence in the light most favorable to the nonmovants, accepting Appellees' version of events and finding their assertions credible even when disputed. The court improperly usurped the role of the jury and factfinder making determinations as to disputed facts. The court also improperly imputed knowledge and actions to all water protectors and protesters, including Appellants, as an undifferentiated mass based on shared protected beliefs, and attributed responsibility for knowledge or actions that occurred hours and even months apart to all water protectors and Appellants regardless of presence and temporal proximity.

Appellees violated Appellants' clearly established rights under the Fourth and Fourteenth Amendments by shooting Appellants with less lethal munitions and blasts of freezing water. Appellants Vanessa

24

Dundon, David Demo, Gul Dullknife II, Frank Finan, Mariah Marie Bruce and Crystal Wilson were unarmed, at most trespassers on unoccupied space, were not attempting to flee, resist arrest or threatening law enforcement and were seriously injured. A jury must determine whether the force that Appellees used that caused serious injuries to the Appellants was objectively unreasonable considering all the facts and the totality of the circumstances.

The individual Defendants-Appellees Kaiser, Kirchmeier and Ziegler participated in and were deliberately indifferent to the violations of Appellants' constitutional rights. Defendants-Appellees Morton and Stutsman Counties and City of Mandan are also liable due to the deliberate indifference of their decision makers and their failure to train or supervise the use of excessive force, particularly with regard to persons gathered for First Amendment activity.

# ARGUMENT

## I.  STANDARD OF REVIEW

In ruling on a motion for summary judgment, courts must view the evidence in the light most favorable to the nonmovant and may not weigh the evidence and resolve disputed issues in favor of the moving party. *Tolan v. Cotton,* 572 U.S. 650, 657 (2014). A grant of summary judgment is reviewed *de novo* and all reasonable inferences from the evidence must be taken in favor of the non-moving party. *Atkinson v. City of Mt. View,* 709 F.3d 1201, 1207 (8th Cir. 2013). Summary judgment is only appropriate when there is no genuine issue in dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Id.*

## II.  The District Court Erred in Failing to Consider the Evidence in Light Most Favorable to Appellants.

The district court below accepted Appellees', the moving parties', version of the facts, and disregarded Appellants' evidence which showed material disputes of fact as to each of the key issues in this case. In doing so, the court violated the fundamental principle that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Tolan v. Cotton,* 572 U.S. at 651.

The district court order begins with a statement of purported undisputed facts, but this recitation of the facts is almost entirely from Appellees' perspective. For example, the court devotes five pages to recounting law enforcement's many arrests of water protectors in the months prior to the event at issue (Add. 8–11); but fails to mention that these arrests were accompanied by escalating law enforcement violence against water protectors, which water protectors understood as attempts to chill their First Amendment rights; or that the majority of arrests were unlawful as evidenced by the tiny percentage that resulted in convictions. The district court also seems to overlook that in its extensive description of these prior events leading up to November 20th, there was absolutely no evidence that any law enforcement officer was ever injured by a water protector. (Add. 6–14.)

Despite this, the district court construed the prior events as supporting a reasonable fear by the officers toward ALL water protectors on November 20–21. In doing so, the court inexplicably disregarded the evidence that the prior conduct of water protectors had been generally peaceful, reflecting their resolve to express their opposition to DAPL nonviolently and not to target law enforcement. If the court had properly viewed the facts in the light most favorable to Appellants and made all reasonable inferences in Appellants' favor, this should have led to the contrary conclusion – that it was unreasonable for the officers to feel their safety was threatened by water protectors.

Further the court improperly premised its ruling on an assertion that law enforcement could unleash maiming force against Appellants based on allegations that some other persons, at some other point in time, including months earlier, had engaged in allegedly unlawful conduct. The only link between these alleged events is the shared political and spiritual beliefs of the persons in opposition to DAPL. The Constitution forbids guilt or punishment by association. The allegations of misconduct at other points in time, even if true, cannot justify the violence unleashed upon unarmed, nonviolent water protectors present on November 20–21, 2016.

The district court devoted an entire eight pages of its decision to "Defendants' version of events". (Add. 24–31.) In this section, the court detailed alleged violence that occurred on a completely different day almost a month before. (Add. 24–26.) The court overlooked that there was no evidence that on November 20th, any of the officers present knew whether any of the water protectors present had been at, let alone involved in any unlawful activity at, those prior alleged events. The court recites numerous contentions of Appellees without ever mentioning that Appellees admitted in depositions that they have no evidence supporting these claims. For example, the court refers to photographs purporting to show various objects that water protectors threw at law enforcement (Add. 28), but fails to mention that Appellees acknowledged in deposition testimony that there was no attempt to

28

collect or photograph any items that they claim had been thrown. The photographs the district court referred to were part of a press release by Appellee Morton County; there was no evidence these had been thrown by water protectors. Appellee's claims, in this same press release, regarding water protectors having "Improvised Explosive Devices" have been shown to be false.

Throughout the district court's recitation of the facts, the court adopts the Appellees' unsupported view that all of the water protectors and observers who came to the bridge at any point during the night of November 20–21 were acting as a single group, and imputing the knowledge and actions of some, to all, including persons who were in no physical or temporal proximity to each other. The court reiterated Appellees' claim that "protestors appeared to be prepared for an assault" on law enforcement and were "organized" in two groups – a "forward staged siege group" [sic] and a "larger group which remained further back south" on the Bridge. (Add. 27–28.) Appellants disputed whether any water protectors were trying to get through the barricade, other than the one man who was immediately arrested. Viewing the evidence in the light most favorable to Appellants, a reasonable inference from the fact that most of the water protectors and observers remained further south at a distance from the barricade is that they were not trying to cross the barricade and were trying to avoid the law enforcement barrage of munitions and water while continuing to

peacefully express their views against DAPL.

Similarly, the court seems to have accepted Appellees' view that the fires during that night were set by water protectors as provocative and threatening acts – and ignored the evidence proffered by Appellants that some of the fires were caused by the law enforcement's shooting of burning chemical agent munitions into the grass, and others were controlled fires water protectors built simply to warm themselves in subfreezing temperatures. (Add. 55 at ¶109; Add. 59 at ¶116.)

Appellants presented evidence disputing the allegations that law enforcement gave repeated warnings over a Long Range Acoustic Device (LRAD), including that the LRAD was broken, and disputing that water protectors threw "large rocks" and other objects at law enforcement. (Add. 28.) Yet again, the district court adopted Appellees', rather than Appellants' view of these disputed facts, concluding that "the record reveals law enforcement officers feared for their physical safety due to imminent threats of serious bodily injury or death they were encountering." (Add. 28) Appellants' evidence disputed that warnings or dispersal orders were given, save one amplified announcement at 6:22 p.m. Despite hundreds of hours of video and audio, Appellees were unable to support their claims of constant and repeat warnings. Such amplified warnings could not have issued without being captured therein. Appellants' evidence showed that Appellees' unsupported claims of an onslaught of large rocks, burning

logs, etc. was at best greatly exaggerated if not entirely fabricated.

Appellants presented ample evidence disputing that the crowd as a whole was threatening or acted as a threatening group, and importantly, there was *no* evidence that any of the Appellants engaged in any threatening conduct whatsoever. The district court accepted that everyone who came and went from the bridge over the ten hours of the event, standing, praying, or protesting without actions against or towards law enforcement, unabatedly posed a threat in the face of the undisputed continuous barrage of freezing water, explosives and impact munitions fired by law enforcement during this same period of time. In doing so, the court failed to view the facts in the light most favorable to Appellants, instead disregarding the evidence showing that Appellees' depiction of the events is highly disputed. As another example, the district court characterized the event as "a group of hundreds, if not over a thousand, of individuals facing off with a clearly outnumbered presence of law enforcement in a rural, open area" (Add. 42; Add. 86.) But law enforcement's own testimony and documents show that at maximum, there were 400–500 protestors over the course of many hours, and up to 350 law enforcement officers present at the Bridge, which if properly viewed in the light most favorable to Appellants is not a scenario in which law enforcement, ensconced behind the massive barricade with all their weapons and gear, were about to be overrun. Demonstrations usually involve more participants than law

enforcement officers; this alone cannot provide a basis for unleashing massive force on all those present. Nor can the failure to properly train personnel in crowd control bootstrap legitimizing using excessive force.

Moreover, the district court failed to recognize that Appellants and others arrived and departed at different times, engaged in disparate peaceful activities, were not there throughout the ten hours of activity, and were not acting in unison with others. Law enforcement may not use force on individuals due to activity or crimes suspected of others. As explained in Section II.B.1 below, the rights under the Fourth and Fourteenth Amendments are individual rights, and force targeted at an individual must have an individualized basis or rationale to be constitutionally imposed.

As the Supreme Court stated with regard to similar error in an excessive force case, "[T]hese facts lead to the inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion." *Tolan v. Cotton*, 572 U.S. at 659. The Supreme Court took the unusual step of vacating the Fifth Circuit decision in *Tolan* because – as here – "the opinion below reflects a clear misapprehension of summary judgment standards in light of our precedents." (*Ibid.*)

> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in

part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to [the plaintiff's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

(572 U.S. at 660.)

## III. A Jury Must Determine Whether the Force Used Against Appellants was Objectively Unreasonable

The District Court below misapplied the law as well as the facts. It must be up to a jury to decide whether the use of impact munitions and water cannons for alleged crowd control against unarmed individuals violates constitutional rights under the Fourth and Fourteenth Amendments.

### A. Law Enforcement Seized Each Appellant under the Fourth Amendment the Moment They Shot Them With Impact Munitions and Freezing Water

The District Court below erred in finding that the Appellants were not subject to a seizure when Appellees' agents shot them with impact munitions and sprayed them with high pressure water cannons. (Add. 48.)

The use of force against Appellants meets the definition of a Fourth Amendment seizure set out in *Torres v. Madrid,* 141 S.Ct. 989, 991

(2021) and *California v. Hodari D.*, 499 U.S. 621, 626 (1991).

In *Torres*, the Supreme Court addressed the issue of whether the application of physical force to a suspect the police are trying to arrest is a seizure if the force fails to stop them. *Id.* at 995. "The application of physical force to the body of a person with the intent to restrain is a seizure, even if the force does not succeed in subduing the person." *Id.* at 993. Thus, in *Torres*, a woman was seized when officers shot her, despite her failure to yield to that force, as it amounted to a seizure by force given the officers' intent to restrain. The appropriate inquiry with regard to a seizure by force is whether the challenged conduct objectively manifests an intent to restrain. *Id.* at 998.

Courts addressing similar facts post-*Torres* have concluded that a constitutionally redressable seizure can occur where, as here, officers use physical force to try to prevent protestors from coming any closer, such as by herding protestors, forming a skirmish line, or failing to provide a means of egress—where such governmental action is intentional and restricts the demonstrators' freedom of movement. *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 262–263 (S.D. Ohio 2021), modified sub nom. *Alsaada v. City of Columbus, Ohio, No. 2:20-CV-3431*, 2021 WL 3375834, at *1 (S.D. Ohio June 25, 2021).

The district court below's conclusion that there was no seizure in the instant case was based on its finding that the evidence established that "*almost* all named-Plaintiffs, moved freely upon and off the Bridge or in

the area after force was used against them." (Emphasis added, Add. 46.)
Even disregarding the court's erroneous adoption of the defendants'
version of the facts, the court confused the test for seizure as based on
the *plaintiffs'* objectively manifested intent, rather than the *defendants'*
objectively manifested intent. The district court conflated a show of
force and/or show of authority with an *actual* use of force, and concluded
that a person subjected to the force would need to subjectively believe
that they were not free to leave as a result of the application of force.
But "[E]ven if a "citizen is able to walk or hobble away," a seizure still
lies, so long as there was an intentional application of physical force."
(*Alsaada*, 536 F. Supp.3d at 264, citing *Jennings v. City of Miami, No.
07–23008-CIV*, 2009 WL 413110, at \*7 (S.D. Fla. Jan. 27, 2009).)
Indeed, the Supreme Court has made clear, "(t)he application of
physical force to the body of a person with the intent to restrain is a
seizure, even if the force does not succeed in subduing the person."
*Torres*, 141 S.Ct. at 993. *California v. Hodari D.,* supra, 499 U.S. at 626.
Supreme Court precedent rejects the district court's contention here
that the Fourth Amendment is not offended by the intentional use of
force that physically injures a citizen but only reduces, rather than
completely eliminating, their freedom of movement. The subjective
intent of the officers deploying the force, whether they meant to move,
repel or hurt the water protectors by striking them with impact
munitions,is irrelevant. An objective standard applies, and free persons

may not be subjected to punishment of any kind through the use of force.

The district court distinguished *Nelson v. City of Davis*, 685 F.3d 867, 872 (9th Cir. 2012), *Coles v. City of Oakland, No. C03–2961 TEH*, 2005 WL 8177790 (N.D. Cal. Apr. 27, 2005); *Rauen v. City of Miami, No. 06–21182-CIV*, 2007 WL 686609 (S.D. Fla. Mar. 2, 2007); and other cases finding use of "less lethal" munitions on protesters to constitute seizure, because in the instant case, the "officers objectively manifested an intent to move protestors away from the Bridge." (Add. 44 at ¶ 89.) But the same is true in most of these cases. For example, in *Alsaada,* the impact of pepper spray impacted many of the protestors, but they were not arrested and were able to leave. Impact projectiles affected protestors' freedom of movement, as in the instant case, by knocking some of them down and making them unable to stand independently. The court found a Fourth Amendment seizure. (*Alsaada*, 536 F.Supp.3d at 264–265). In *Coles*, police intentionally applied force – including wooden bullets and bean bags – to push plaintiffs from the port toward the transit station. Like Appellees here, the *Coles* defendants argued that they were only trying to disperse the crowd, but the district court found the intentional application of force to restrain their movement a Fourth Amendment seizure. (*Coles v. City of Oakland,* 2005 WL 8177790, at *4–5.)

In *Atkinson v. City of Mountain View*, this Court addressed and

dismissed an argument similar to the district court's here: "It would make little sense to ask whether a person felt 'free to leave' while an officer restrained the person's freedom of movement through physical force because the force itself necessarily—if only briefly— restrained [the person's] liberty." *Atkinson v. City of Mt. View*, 709 F.3d at 1208–1209 (internal quotations omitted).

The Supreme Court has repeatedly held that the Fourth Amendment analysis is not a subjective one. See, e.g., *Ashcroft v. al–Kidd*, 563 U.S. 731, 736 (2011); *Brendlin v. California*, 551 U.S. 249, 261 (2007); *Whren v. United States*, 517 U.S. 806, 813 (1996). "The intent that counts under the Fourth Amendment is the intent that has been conveyed to the person confronted, and the criterion of willful restriction on freedom of movement is no invitation to look to subjective intent when determining who is seized." *Brendlin,* 551 U.S. at 260–261 (internal quotation marks and citation omitted).

Here, the officers restricted plaintiffs' freedom of movement when they fired "less lethal" munitions, explosive grenades, and chemical weapons at plaintiffs and sprayed plaintiffs with water cannons, similar to the officers in *Nelson v. City of Davis*, who, responding to an unruly party involving 1,000 university students, launched pepper balls into the crowd, and a student was shot in the eye. The Nelson defendants argued that their actions could not constitute a seizure because their intent was to disperse the crowd, not to make arrests, but the Court of

Appeals rejected this argument. "Whether the officers intended to encourage the partygoers to disperse is of no importance when determining whether a seizure occurred. The officers took aim and fired their weapons towards Nelson and his associates." Noting that "the Fourth Amendment regulates conduct rather than thoughts," the court held that regardless of the officers motives, their application of force "unquestionably constituted a seizure under the Fourth Amendment." *Nelson v. City of Davis*, 685 F.3d at 877–878; and see, e.g., *Johnson v. City of San Jose*, No. 21-CV-01849-BLF, 2022 WL 799424, at *5 (N.D. Cal. 2022) (shooting protester with projectile can constitute seizure with intent to restrain movement).

The facts of the instant case are not like those which led to the decision in *Black Lives Matter D.C. v. Trump*, where the plaintiffs alleged the purpose of the officers' use of force was to clear the street to make way for the president. *Black Lives Matter D.C. v. Trump*, 544 F.Supp.3d 15, 32 (D.D.C. 2021). That decision rested on the authority of police to clear the space in front of the White House for security purposes in urgent circumstances.

*Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 840 (8th Cir. 2021); *Buck v. City of Albuquerque*, 2007 WL 9734037, at 31 (D.N.M. 2017); and *Molina v. City of St. Louis*, 2021 WL 1222432, at *11 (E.D. Mo. 2021) are inapposite in that in each of those cases, the plaintiffs were only affected by tear gas or pepper spray, which disperse through the air,

rather than by being directly shot with a munition which knocked them down, hobbled them, or tore open their skin. None of the Appellants were solely and only affected by chemical agents. Moreover, those cases predate *Torres*.

The force of the water and munitions knocked most of the Appellants and many of the other assembled persons off their feet or otherwise restricted their freedom of movement by stopping them in their tracks and causing serious injuries. Appellants were subjected to force while moving south, away from the barricade as well as while near the barricade or standing still. Such restraint on movement amounts to a seizure. *Nelson*, 685 F.3d at 882–883.

The striking of Appellants with munitions and freezing blasts of water unquestionably constituted seizure under the Fourth Amendment.

### B. A Jury Should Decide the Reasonableness of the Use of Force.

Excessive force claims under the Fourth Amendment are governed by a reasonableness standard. *White v. Jackson*, 865 F.3d 1064, 1074 (8th Cir. 2017), citing *Graham v. Connor*, 490 U.S. 386, 396 (1989). A determination is made based upon the totality of the circumstances. *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985). Whether the force used is reasonable requires a careful balancing of the intrusion on the

individual and any countervailing governmental interests particularly warranting careful attention to the facts and circumstances of each particular case. *Id.*

To decide whether the force used to seize a suspect was excessive and thus "unreasonable" for purposes of the Fourth Amendment, relevant factors include (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Mitchell v. Kirchmeier*, 28 F.4th 888, 898 (8th Cir. 2022). "Applying these factors, we have held time and again that, if a person is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, then it is unreasonable for an officer to use more than *de minimis* force against him." *Ibid.* See also, *Baude v. City of St. Louis*, 476 F. Supp. 3d 900, 913 (E.D. Mo. 2020) (Viewing the facts in the light most favorable to the plaintiff the deployment of pepper spray against him was not objectively reasonable.)

The *Mitchell* incident took place in the same location as the instant case, Backwater Bridge near the law enforcement barricade, also late at night, approximately two months later. Having heard that law enforcement officers were shooting unarmed protestors, including elders and women, Mitchell decided to go to the bridge, and observed from a distance that law enforcement officers were indeed shooting people.

Mitchell positioned himself in front of the crowd and several officers fired lead-filled bean bags from their shotguns at Mitchell. Mitchell was hit in three places, including his head. Mitchell was arrested and charged with criminal trespass and obstruction of a government function. *Mitchell v. Kirchmeier,* 28 F.4th at 894.

This Court reversed the district court's order dismissing Mitchell's Fourth Amendment claim because "the complaint did not suggest that Mitchell was suspected of anything more than trespassing and obstructing a government function, both nonviolent misdemeanors. *See* N.D. Cent. Code §§ 12.1–22–03, 12.1–08–01. Nor did the complaint suggest that Mitchell threatened anyone, fled or resisted arrest and this Court recognized that "gentler treatment" has been found to constitute more than *de minimus* force. *Mitchell,* 28 F.4th at at 898. It is 'clearly established' that the use of more than *de minimis* force in circumstances like these violates the Fourth Amendment. *Ibid.*

A similar application of the G*raham* factors to the circumstances of the instant case leads to the conclusion that a jury could certainly find that the law enforcement conduct here was objectively unreasonable.

### 1. Severity of Crime at Issue

Although the instant case was decided on summary judgment, rather than on a motion to dismiss, the district court failed to view the facts in the light most favorable to Appellants, ignoring the disputes of fact, as

argued fully above. It is undisputed that Appellants, who were never arrested or charged, at the most were nonviolent misdemeanants just like Mr. Mitchell, who had gathered in the same location for a similar purpose. Appellees themselves admit not everyone in the crowd was engaged in allegedly riotous conduct.

The court found that Appellants were trespassing and that they were given notice of such, in particular by the two No Trespassing signs. (Add. 54; Add. 107.) Yet each of the named plaintiffs testified that they did not see the signs, which were off to the sides on the embankment behind the concertina wire, one of which was removed by law enforcement during the incident. Law enforcement had been allowing pedestrians to walk on the bridge in the weeks before this incident. The district court also found that some of the water protectors were committing misdemeanors such as removing part of the barricade or rioting, but there was no evidence that any of the Appellants participated in these acts.

Law enforcement fired indiscriminately and repeatedly into the crowd and made no effort to identify a specific threat when the force was used. Appellants who were struck were not throwing anything at law enforcement or threatening law enforcement in any way. The evaluation of whether a use of force was reasonable is determined by "looking primarily at the threat present at the time" law enforcement deployed the force. *Banks v. Hawkins,* 999 F.3d 521, 525–26 (8th Cir.

2021).

The court attributed acts allegedly taken by a handful of individuals at particular moments in time to all Appellants and the entirety of the hundreds of people who came and went from the Bridge over many hours, regardless of whether they participated or were even at the Bridge when acts by others occurred. Allegations of unlawful acts were summarily attributed collectively to protestors as a group, regardless of any persons' temporal or physical proximity, to justify the indiscriminate use of massive force against hundreds of different people for hours.

Appellants may not be punished for the acts of others and law enforcement may not reasonably shoot individuals simply because others may have engaged in unlawful acts. *See, e.g.*, *Fogarty v. Gallegos*, 523 F.3d 1147, 1158 (10th Cir. 2008) (police cannot arrest plaintiff because "some [other] individuals may have broken the law"); *Barham v. Ramsey*, 434 F.3d 565, 574 (D.C.Cir. 2006) (police cannot justify arresting individuals based on "refer[ences] generically to what 'demonstrators' were seen doing"); *Papineau v. Parmley*, 465 F.3d 46, 59 (2d Cir. 2006) (police cannot seize or arrest indiscriminately where a few within a protesting crowd had violated the law at an earlier time and desisted). See also, *Claiborne Hardware v. NAACP*, 458 U.S. 886 (1982) (First Amendment requires precision in distinguishing between those who are engaging in unlawful conduct and those who are not.)

There was no evidence that the entire crowd was acting in concert or as a unit to violate the law. Videos and testimony of the Appellants and others do not show any unified surging toward the police line. Appellees failed to offer any evidence that the water protectors had a single minded purpose or acted as a group to breach the police line, and importantly, there was no pipeline construction going on north of the barricade at that time. These facts are distinguished from the situation in *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012). In *Bernini,* protestors were trying to get to the downtown Saint Paul site where the Republican National Convention was being held, despite an existing order that no one was allowed to enter the downtown area. The *Bernini* plaintiffs challenged their arrests, rather than use of force against them. *Bernini,* 665 F. 3d at 1006 ("The record does not show that any of the defendants directly used force against any of the plaintiffs.") See also, *Baude v. City of St. Louis*, 476 F.Supp.3d at 910 (defendants failed to establish it was objectively reasonable to believe plaintiffs were acting as a unit when they were milling about and allowed to come and go from the area).

Here, there was no individualized justification for using force on the Appellants, each of whom was injured as a result of law enforcement's application of force. An individual may not be seized without particularized probable cause and cannot be subjected to force simply by being in proximity to those who may be suspected of criminal activity.

This is particularly so in a situation like this one with a fluid crowd in which individuals are coming and going. *Barham v. Ramsey, supra,* 434 F.3d 565 [An officer may not predicate a seizure on an individual's "mere propinquity to others independently suspected of criminal activity,"] quoting *Ybarra v. Illinois,* 444 U.S. 85, 91 (1979)); *Vodak v. City of Chicago,* 639 F.3d 738, 745 (7th Cir. 2011) [mass arrest could not be justified based on dispersal orders where it was not reasonable for police to believe people who arrived at different times had heard dispersal order].

### 2. No Active Resistance, Attempts to Flee or Immediate Threat to Safety of Officers or Others

It is undisputed that none of the Appellants actively resisted or attempted to flee or evade arrest. At most, the allegations are that some of the Appellants engaged in passive resistance by continuing to engage in protest and failing to leave while Appellees continued to fire upon the crowd. In fact no one in the crowd actively resisted arrest, and the single individual who attempted to climb over the barricade was immediately taken into custody.

The district court relied most heavily on its finding that the law enforcement officers perceived the protectors as a threat. (Add. 58–59, 114–118.) But the reasonableness of this belief was contested by Appellants' declarations, Appellees' depositions, and the video evidence.

There was no evidence that any of the Appellants threw any object at, or otherwise threatened, law enforcement in any way. There was no evidence that any Appellant engaged in, or planned to engage in, conduct that was unlawful nor is there any evidence that would justify the use of force against any particular Appellant.

Taking the video evidence in the light most favorable to the Appellants, as this Court must, overwhelmingly depicts peaceful protestors and debunks Appellees' claim that there was widespread aggressive activity in the crowd. The crowd is generally depicted in the video evidence a distance away from the barricade, engaged in peaceful activity such as praying, singing, photographing, expressing themselves verbally, or simply standing. The video evidence does not support Defendants' claim that law enforcement was under attack by a "constant barrage of objects being thrown at law enforcement" (Add. at 73) or that a large group was trying to get through the barricade. In fact, in 200 hours of video, there are only approximately ten instances of individuals throwing objects in the direction of the barricade, not a constant barrage or substantial portion of the crowd. There is no video evidence of anyone throwing logs or other large objects. There is no documentation of what time an item was thrown at law enforcement, or the number of items thrown, and no such items were photographed or collected for evidence.

Moreover, the fact that this event occurred over the course of ten

46

hours gave law enforcement many opportunities to halt or rethink its constant barrage of munitions and freezing water directed at protectors. There was no evidence that any officer was seriously injured at any time. It is hard to imagine that a reasonable law enforcement officer could feel objectively threatened with serious injury for ten hours when armed behind a heavily fortified barricade and supported by hundreds of other law enforcement as well as armored and fire department vehicles when facing an unarmed, largely peaceful crowd. Even if a law enforcement officer believed a person was about to attack him that belief could be deemed unreasonable. *Banks v. Hawkins,* 999 F.3d 521, 526 (8th Cir. 2021) (*citing Ribbey v. Cox,* 222 F.3d 1040, 1043 (8th Cir. 2000)*.* Moreover, whether an officer reasonably interpreted the suspect's actions as a real threat to his personal safety is a matter for a jury to decide. *Banks v. Hawkins,* 999 F.3d at 528 n. 6 *(citing Brown v. City of Golden Valley,* 574 F.3d 491, 497 (8th Cir. 2009).)

### 3. Other Factors: Warnings and Extent of Injury

The existence, extent and nature of warnings given to the water protectors are disputed facts. Appellants did not see or hear warnings. There is no contrary direct evidence. Warnings were not given throughout the 10 hour continuous deployment of impact munitions. The district court below accepted and credited, contrary to the standard of review on summary judgment, law enforcement claims that

47

"warnings were 'constantly' being given either by officers personally, or through amplified means." (Add. 64.) Defendants admit that amplified orders were at best limited. The nature and extent of warnings and whether they were calculated by law enforcement to be heard by all who were subsequently shot and injured is hotly contested. (Sheriff Kaiser, e.g., admitted he did not know whether everyone in the crowd could hear the announcements. (App.973 at 44; R. Doc. 239–14.)

Warnings must be given by law enforcement whenever feasible. See e.g., *Loch v. City of Litchfield,* 689 F.3d 961, 967 (8th Cir. 2012) (law enforcement should give warning before employing deadly force); *Procknow v. Curry*, 826 F.3d 1009 (8th Cir. 2016) (warnings prior to use of taser); *Deorle v. Rutherford,* 272 F. 3d 1272, 1284 (9th Cir. 2001) (warnings prior to less-than-deadly force should be given if feasible especially in crowd-control situations). This Court recently recognized disputes of fact regarding the number of orders and who heard them in the context of alleged announced dispersal orders provided personally and via public address. *Baude v. Leyshock,* 23 F.4th 1065).

Additionally, Appellants received painful and often permanent injury. Dundon, shot in the eye, and Demo, shot in a hand raised shoulder height, had to undergo surgery. Dullknife and Wilson were shot in the chest and Bruce in the genitals. Firing "a shotgun loaded with a lead-filled bean bag at a person, regardless of whether one is aiming at the person's face, is to use more than *de minimis* force against

the person." *Mitchell v. Kirchmeier*, 28 F.4th 888, 898-899; *and see Montoya v. City of Flandreau*, 669 F.3d 867, 872 (8th Cir. 2012) [explaining that "the severity of the injuries [the plaintiff] sustained is a relevant factor in determining the reasonableness of the force used".]

Retired Police Commissioner Thomas C. Frazier concluded that the use of water in freezing temperatures was punitive, unnecessary, cruel and inhumane. The use of water cannons in crowd contexts can lead to serious injury or death. (App.244; R. Doc. 14–20; Anna Feifenbaum, <https://www.opendemocracy.net/en/opensecurity/white-washing-water-cannon-salesmen-scientific-experts-and-human-rights/> Open Democracy (Feb. 25, 2014.).) Commissioner Frazier also concluded that officers shot indiscriminately at protesters making no attempt to either distinguish which persons were actually a threat or to target less vulnerable parts of the body. Moreover, the Commissioner further found that individuals outside of any area that remotely could be considered as threatening to law enforcement were targeted and subjected to serious bodily injury.

Viewing the totality of the circumstances in the light most favorable to Appellants, including that at most minor misdemeanors were at issue, the lack of immediate threat to law enforcement, no active resistance or attempts to flee, the failure to provide adequate warnings, and the resulting serious injuries suffered by Appellants, a jury could certainly find law enforcement's uses of force here were objectively

unreasonable.

## IV. Alternatively, Appellants Are Protected From Unreasonable Force by the Fourteenth Amendment

Even if this Court were to find that no seizure occurred, Appellants would still be protected by the substantive due process protections of the Fourteenth Amendment against arbitrary governmental action or the exercise of power without reasonable justification. *Cty of Sacramento v. Lewis*, 523 U.S. 833, 844–845 (1998)

A pretrial detainee can prevail on an excessive force due process claim under the Fourteenth Amendment by showing a defendant's conduct was objectively unreasonable. *Kingsley v. Hendrickson, 576 U.S. 389* (2015). See also, *Whitney v. City of St. Louis, Mo,* 887 F.3d 857, 860 n.4 (8th Cir. 2018) (*Kingsley* confined to excessive force claims for pretrial detainees.) See also, *Edrei v. Maguire*, 892 F.3d 525, 537 (2d Cir. 2018) (*Kingsley* provides the appropriate standard for all excessive force claims brought under the Fourteenth Amendment.) A person not in custody and out on a roadway, must have at least as much protection from being subjected to excessive force as a pretrial detainee.

## V. Defendants Are Not Entitled to Qualified Immunity

### A. Standard of Review

In reviewing *de novo* a district court's summary judgment ruling

regarding qualified immunity, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. at 656; *Williams v. City of Burlington*, 27 F.4th 1346, 1351 (8th Cir. 2022).

### B. Clearly Established Right to Be Free From Excessive Force

Public Officials are personally protected from liability by qualified immunity when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Williams v. City of Burlington,* 27 F.4th at 1350, citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Whether officials are owed qualified immunity involves two questions: (1) if the facts alleged show the officer's conduct violated a constitutional right when taken in the light most favorable to the party asserting the injury; and (2) whether that right was "clearly established" at the time of the defendants' alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

There does not have to be a previous case with exactly the same factual issues, rather the right is clearly established if a reasonable officer would be on notice from prior cases that the use of force in the circumstances presented would violate the law. *Williams v. City of Burlington,* 27 F.4th at 1352, and cases cited therein. If a person is not

suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, "we have held time and again" that it is "unreasonable for an officer to use more than *de minimus* force against him." *Mitchell v. Kirchmeier*, 28 F.4th at 898 and cases cited therein.

As this Court noted in *Mitchell,* "(o)ur cases clearly establish that gentler treatment than [being shot with a "less lethal" munition] constitutes more than *de minimus* force. *See, e.g.*, *Small*, 708 F.3d at 1005–06 (holding that it was clearly established that tackling from behind without warning constitutes more than *de minimis* force); *Montoya*, 669 F.3d at 870, 872–73 (holding that it was clearly established that causing a person to trip by "sweeping her . . . leg" constitutes more than *de minimis* force); *Shannon*, 616 F.3d at 858, 863–64 (holding that it was clearly established that a takedown constitutes more than *de minimis* force). *Mitchell,* 28 F.4th at 898-899. See also, *Baude v. Leyshock*, 23 F.4th 1065 (Baude's right to be free of kettling, pepper spray and application of zip ties clearly established); *Johnson v. Carroll*, 658 F.3d 819, 828 (8th Cir. 2011) ("throw[ing] to the ground and mac[ing] a nonviolent, suspected misdemeanant who was not fleeing or herself resisting arrest" is unlawful).)

Further, "[a]s of June 2007, it was clearly established that an officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment." *Nance v. Sammis,* 586 F.3d 604, 611–612 (8th Cir. 2009).

Appellants here were subjected to freezing water blasts and impact munitions, far from *de minimus* force, and directly dispute they were threatening, fleeing or resisting and that at most they were trespassers. Law enforcement officers are not protected by qualified immunity.

## VI. A Jury Must Determine Whether Defendants Have Supervisory Liability or Liability Pursuant to *Monell*

Individual Appellees Kirchmeier, Ziegler and Kaiser are subject to supervisory liability and governmental entity Appellees Morton County, City of Mandan and Stutsman County are subject to liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

### A. Defendant Supervisors Were Direct Participants and Failed to Intervene

Supervisors can be held liable under §1983 (1) if the supervisor directly participated in the constitutional violation; (2) if the supervisor failed or refused to intervene when a constitutional violation took place in his presence; (3) if the supervisor's failure to train or supervise the employee caused the constitutional violation; or (4) if the supervisor created a policy or custom under which the constitutional violation occurred. See, e.g., *B.J.G. ex rel. McCray v. St. Charles City Sheriff, No. 4:08-CV-1178-CDP*, 2010 U.S. Dist. LEXIS 44205, 2010 WL 1838414, at *3 (E.D. Mo 2010), *aff'd sub nom. B.J.G. ex rel McCray v. St. Charles*

*City Sheriff*, 400 F.App'x 127 (8th. Cir. 2010).

Supervisory officers who act with "deliberate indifference toward the violation," *Wagner v. Jones,* 664 F.3d 259, 275 (8th Cir. 2011) (quoting *Ottman v. City of Independence*, 341 F.3d 751, 761 (8th Cir. 2003)), or, in other words, are aware that their subordinates' actions create a "substantial risk of serious harm," may be liable if they fail to intervene to mitigate the risk of harm, *Wagner v. Jones*, 664 F.3d 259 (quoting *Kahle v. Leonard*, 477 F.3d 544, 551–52 (8th Cir. 2007)) (internal quotation marks omitted); *Baude v. Leyshock*, 23 F.4th at 1074. Deliberate indifference may be shown when a supervisor knows about the violation and facilitates it, approves it, condones it or turns a blind eye to it. *Wagner, supra.*

Defendant-Appellant Kaiser, who was on scene, as well as Defendants-Appellants Kirchmeier and Ziegler were directly involved in supervising the individual law enforcement officers called to the bridge with impact munitions, who then began indiscriminately firing at the crowd. Kirchmeier and Ziegler were direct supervisors of those on the scene who reported to them. The three knew that impact munitions were being fired and that freezing water was being used as force against the protectors. None of these supervisors intervened in or attempted to mitigate these uses of force. All were specifically involved in the decision to use water as force with Kaiser making this decision on the scene after consultation with command. They certainly condoned

these violations and turned a blind eye to the harm being perpetrated on the water protectors. These supervisors are individually liable to Appellants.

## B. A Jury Could Find the Government Entities Liable Under *Monell*

Appellees Morton County, Stutsman County and City of Mandan are liable for the acts of their policy makers as well as for their policies of failing to train and supervise these law enforcement officers. *Canton v. Harris,* 489 U.S. 378 (1989). Importantly, in the unlikely event that qualified immunity is found to protect individuals, a governmental entity may not avail itself of a qualified immunity defense. *Owen v. City of Independence,* 445 U.S. 622, 650 (1980).

Even if a plaintiff is unable to identify an individual defendant, policy liability may be found. *Wilson v. Town of Mendon*, 294 F.3d 1, 7 (1st Cir. 2002) (A plaintiff may fail to name the correct individual defendants, or any individual defendants, but could still recover against the municipality if injured by a municipal policy.) See also, *Hopkins v. Andaya,* 958 F.2d 881, 888 (9th Cir. 1992) (city could be liable for improper training and procedure even if the officer was found not liable for excessive use of force); *Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir. 1985) (A municipality's failure to provide adequate jail funding or staffing may cause a constitutional violation even if the

individual staff members involved are doing the best they can in a bad situation.); *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985) (A municipality may be liable where the plaintiff's injury results from improper police training or procedure even if the individual officer is exonerated).

### 1. Acts of Policy Makers

"Municipal liability may attach based on the single act or decision of a municipal decision-maker if the decision-maker possesses final authority to establish municipal policy over the subject matter in question." *Speer v. City of Wynne*, 276 F.3d 980, 985–87 (8th Cir. 2002) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)). *See also Vodak v. City of Chi.,* 639 F.3d 738, 747 (7th Cir. 2011) (Liability may be imposed on a government entity for a constitutional tort when the tort was authorized or directed at the policymaking level of government.) (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 402–04 (1997); *Jett v. Dallas Independent School District*, 491 U.S. 701, 736–38 (1989)).

These commanders directed, authorized and ratified the use of force on peaceful protestors at the Bridge on November 20, 2016, including the use of the water cannons. Even if some decisions were made by subordinates, the issue of whether a final policymaker ratified a subordinate's decision is a question of fact for the jury to decide. *Soltesz*

*v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 947 (8th Cir. 2017).

## 2. Policy Failure to Train and Supervise

The Supreme Court decades ago acknowledged that an entity may be liable under *Monell* for failure to adequately train, supervise or control individual law enforcement officers who violate a plaintiff's rights. In *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) the U.S. Supreme Court defined the contours of an actionable *Monell* failure to train claim as when the failure to train evidences deliberate indifference, such as when the need for more or different training is obvious and the entity fails to take reasonable steps to train its employees. *City of Canton*, 489 U.S. at 390.

Although as Appellees acknowledge, water protectors had been engaging in protests and marches for months prior to November 20, 2016, it is undisputed that Appellees provided the officers with no training whatsoever regarding orders to disperse or to the use of force in a crowd or demonstration context. No training was given particular to the weapons used that were indiscriminate in nature, including gas and water cannons. Impact munitions were fired indiscriminately without any training as to the standard for such a high level of force, what area of the body may be appropriately targeted or how that force should be utilized to direct a crowd.

Additionally, there was no effort to supervise or control the line

officers in their firing of the impact munitions that subjected Appellants to injury. Absolutely no effort was made to prevent or even mitigate the uses of force that continued unabated for hours, and there was no direction to pause and reassess when the force, asserted to be used to disperse people from the bridge, was not successful in doing so. A jury could find these governmental entities liable for a policy of completely failing to undertake any training or supervision at all of these law enforcement officers who were let loose to fire away with massive and maiming force at the water protectors.

## CONCLUSION

For the foregoing reasons, the district court's decision granting summary judgment to Defendants-Appellees should be reversed.

Respectfully submitted,

Dated: April 22, 2022                    By: /s/ Rachel Lederman

One of the Attorneys for Appellants
Vanessa Dundon, Crystal Wilson, David Demo, Guy Dullknife, III, Mariah Marie Bruce, and Frank Finan

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **12,741 words**, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, **14-pt Century Schoolbook**, using TypeLaw.com's legal text editor.

Dated: April 22, 2022                     By: /s/ Rachel Lederman

# CIRCUIT RULE 28A(h) CERTIFICATION

The undersigned hereby certifies that I have filed electronically, pursuant to Circuit Rule 28A(h), a version of the brief and addendum in non-scanned PDF format. I hereby certify that the file has been scanned for viruses and that it is virus free.

Respectfully submitted,

Dated: April 22, 2022

By: /s/ Rachel Lederman

One of the Attorneys for Appellants
Vanessa Dundon, Crystal Wilson, David Demo, Guy Dullknife, III, Mariah Marie Bruce, and Frank Finan

## Corporate Disclosure Statement

Pursuant to Fed. R. App. P. 26.1 and 8th Cir. Rule 26.1A, the undersigned counsel for Appellants hereby certifies that all Appellants are individuals and no nongovernmental corporation is a party to this proceeding.

Respectfully submitted,

Dated: April 22, 2022    By: /s/ Rachel Lederman

One of the Attorneys for Appellants
Vanessa Dundon, Crystal Wilson, David Demo, Guy Dullknife, III, Mariah Marie Bruce, and Frank Finan

# Attorney's Fees

Plaintiffs intend to seek attorney's fees and costs for this appeal, pursuant to 42 U.S.C. §1988.

Respectfully submitted,

Dated: April 22, 2022          By: /s/ Rachel Lederman

One of the Attorneys for Appellants
Vanessa Dundon, Crystal Wilson, David Demo, Guy Dullknife, III, Mariah Marie Bruce, and Frank Finan

# CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Respectfully submitted,

Dated: April 25, 2022          By: /s/ Rachel Lederman

One of the Attorneys for Appellants
Vanessa Dundon, Crystal Wilson, David Demo, Guy Dullknife, III, Mariah Marie Bruce, and Frank Finan